UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ORRIN MONROE CORWIN,

                    Plaintiff,

-vs-                                            Case No.  6:02-cv-1377-Orl-19KRS

WALT DISNEY WORLD COMPANY

                    Defendant.
_____

# ORDER

This case comes before the Court on the following:

1.    Plaintiff Orrin Monroe Corwin's Motion for Clarification.  (Doc. No. 250, filed on December 8, 2004).  Memorandum of Law in Support of Motion for Clarification. (Doc. No. 251, filed on December 8, 2004).

2.    Defendant Walt Disney World Co., Inc.'s Memorandum of Law in Opposition to Plaintiff Orrin Monroe Corwin's Motion for Clarification.  (Doc. No. 275, filed on January 27, 2005).

3.    Plaintiff Orrin Monroe Corwin's Motion for Reconsideration.  (Doc. No. 248, filed on December 8, 2004).  Memorandum of Law in Support of Motion for Reconsideration. (Doc. No. 249, filed on December 8, 2004).

4.    Defendant Walt Disney World Co.'s Memorandum of Law in Opposition to Plaintiff's Motion for Reconsideration.  (Doc. No. 276, filed on January 27, 2005).

**Background**

On November 19, 2002, Plaintiff Orrin Monroe Corwin filed a complaint against Defendants The Walt Disney Company, a Delaware corporation, and Walt Disney World Company, a Florida corporation, alleging copyright infringement.  (Doc. No. 1, filed on November 19, 2002).  On April 11, 2003, the Court dismissed Plaintiff's suit against The Walt Disney Company for lack of personal jurisdiction.  (Doc. No. 37).  On November 12, 2004, the Court granted Defendant Walt Disney World Company's motion to exclude Plaintiff's expert reports.  (Doc. No. 229, filed on November 15, 2004). The Court excluded portions of the reports of Thomas Colbert, Robert Rydell, Peter Alexander, and Frank Costantino, finding that these experts utilized an improper methodology that impermissibly compared the ideas contained in the Miniature Worlds painting and Epcot rendering and failed to examine the level of protectable expression.  The Court also found that the expert reports contained lists of similarities that were inherently subjective and unreliable.  The Court struck the affidavits of Colbert, Rydell, Alexander, and Costantino and the supplemental expert report of Peter Alexander, finding that such reports were not timely filed.  The Court denied Plaintiff's motion to strike the expert report of Robert Gorman and found that Gorman used a proper methodology.  Finally, the Court granted Defendant's motion for summary judgment.

On March 24, 2005, Plaintiff filed 255 separate exhibits that had not been previously considered by the Court.  The Court has evaluated each of these exhibits to determine whether they create a genuine issue of material fact on any issue before the Court.

Plaintiff now moves for reconsideration and clarification of the Court's Order.[1]

---

[1] The facts delineated in the Court's Order on Defendant's Motion for Summary Judgment (Doc. No. 229) are incorporated into this Order.

**Motion for Clarification**

Plaintiff's motion for clarification is actually a supplement to his motion for reconsideration because Plaintiff's brief urges the Court to consider amending its prior findings.  Although Plaintiff's motion for clarification violates a Court Order on page limitations,[2] the Court will analyze the arguments raised in Plaintiff's motion for clarification under the standard of review for motions for reconsideration.

**Standard of Review**

The Eleventh Circuit has described a motion for reconsideration as falling within the ambit of either Rule 59(e) (motion to alter or amend a judgment) or Rule 60(b) (motion for relief form judgment).  *Region 8 Forest Serv. Timber Purchases Council v. Alcock*, 993 F.2d 800, 806 n.5 (11th Cir. 1993).  The decision to grant such relief is committed to the sound discretion of the Court and will not be overturned on appeal absent an abuse of discretion.  *Id.* at 806.  The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence.

---

[2] Local 3.01(c) states that "[a]bsent prior permission of the Court, no party shall file any brief or legal memorandum in excess of twenty (20) pages in length."  On December 7, 2004, Plaintiff filed a motion to extend the page limits in his brief. (Doc. No. 242).  Plaintiff stated that he had filed one memorandum of law to address all the issues raised in his motions for clarification and reconsideration and that the memorandum totaled thirty pages in length.  (*Id.* at 2).  Plaintiff claimed that the issues raised in the motions for clarification and reconsideration were intertwined and that the filing of separate memoranda of law would be inefficient, duplicative, and confusing.  (*Id.* at 1).  On December 15, 2004, the Court granted Plaintiff's motion to file one thirty-page memorandum of law to address the issues raised in his motions for clarification and reconsideration.  (Doc. No. 258).  The record reflects that Plaintiff filed a thirty-one page brief in support of his motion for reconsideration which is separate from the twenty-two page brief Plaintiff submitted in support of his motion for clarification.  Thus, Plaintiff has submitted fifty-three pages of memoranda to the Court.  James Etscorn, Defendant's counsel, testified by affidavit that Tracy Long, one of Plaintiff's attorneys, contacted him and asked for permission to file one 50 page brief in support of a motion for reconsideration.  (Doc. No. 276, Ex. D, "Affidavit of James Etscorn," ¶ 6).  Etscorn did not agree to this request.  (*Id.*)  Counsel for Plaintiff is admonished to comply with the Orders and Local Rules of the Court.

*Burger King Corp. v. Ashland Equities, Inc.*, 181 F.Supp.2d 1366, 1369 (S.D. Fla. 2002).  There are three grounds for reconsideration: "(1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice."  *Id.*  In order to reconsider a judgment, there must be a reason why the Court should reconsider its prior decision, and the moving party must set forth facts or law of a strongly convincing nature to induce the Court to reverse its prior decision.  *Id.*  A motion for reconsideration should not be used to reiterate arguments previously made.  *Id.*  Reconsideration of a previous order is an extraordinary remedy to be employed sparingly.  *Id.*

**Analysis**

Plaintiff raises three main arguments in his motion for clarification.  First, Plaintiff urges the Court to reconsider several issues regarding the striking of the expert witness reports and affidavits. Plaintiff asserts that the experts compared expressive aspects of the Miniature Worlds painting and Epcot rendering rather than ideas and that the experts' affidavits were timely filed.  Next, Plaintiff contends that the Court erred in analyzing whether the Miniature Worlds painting and Epcot rendering were substantially similar, arguing that the dissection test is inapplicable to works of visual art, that the Court misapplied the virtual identicality standard to the Epcot rendering and Miniature Worlds painting, and that the Court should receive guidance in its analysis from analogous architectural cases. Finally, Plaintiff argues that he has created a genuine issue of material fact on the substantial similarity issue.

*1. Issues Relating to Expert Reports and Affidavits*

*a.      Argument that Plaintiff's Experts used a Proper Methodology*

Plaintiff first argues that his experts conducted their analysis at the protectable level of

expression and did not compare ideas.  Plaintiff has included the affidavit of Thomas Colbert in

support of his argument that Colbert's analysis in his expert report was proper.  Colbert claims from

his "objective review of the ruling and opinion" of the Court that it appears that several critical issues

were misunderstood or not taken into account.  (Doc. No. 251, Ex. B, "Colbert affidavit," filed on

December 8, 2004, ¶ 3).  First, Colbert states that the Court misunderstood the methodology that he

employed in analyzing the similarity between the expression of ideas in the Miniature Worlds painting

and the Epcot rendering.  (*Id.* at ¶ 4).  Colbert testifies that his methodology conforms to generally

accepted methods covered by the National Council of Architectural Registration Boards licensing

examinations and the performance criteria required of all accredited schools of architecture.  (*Id.* at ¶

6).

Colbert contends that the second issue that was misunderstood by the Court is the complex

relationship that exists between ideas and the expression of those ideas.  (*Id.* at ¶ 20).  Colbert states

that he did not rely on conceptions and examined only the expression of ideas when conducting his

analysis.  (*Id.* at ¶ 21).  Colbert testifies that concepts and expressions are not always entirely or clearly

independent of one another because "these are often interchangeable terms depending on the way you

want to discuss something." (*Id.*)  Ideas are contained within expression.  (*Id.*)

While Colbert urges the Court to reconsider its ruling striking his report, the Court properly

found that his expert report suffers serious infirmities that demonstrate a fundamental

misunderstanding of the idea-expression dichotomy in copyright law.  *Herzog v. Castle Rock

Entertainment*, 193 F.3d 1241, 1248 (11th Cir. 1999).  It is a basic precept of copyright law that the

protection granted to a copyrightable work extends only to the expression of an idea and never to the

idea itself.  *Id.*  Colbert used legally impermissible comparisons between the Epcot rendering and

Miniature Worlds painting.  In Section II of the report, Colbert states that the Miniature Worlds painting and Epcot rendering share basic concepts because both are designs for large scale recreational theme parks, both are described as being intended to create a climate of international understanding, and both are intended as major recreation destinations.  (Doc. No. 152, Ex. A, "Colbert Report," filed on August 31, 2004, p. 2).  Colbert states that the "basic conceptions of the Waters and the Disney designs are identical" and the "overall concept" is woven together into "one overall idea."  (*Id.*)  In Section III of the report, Colbert notes similar elements between the Epcot rendering and Miniature Worlds painting and states that both were intended to cater to large numbers of people, both were designed to be located near a major city, and both include youthful workers in national dress.  (*Id.* at 3).  Section IV contains a list of 20 similar ideas such as the incorporation of a large parking area, access to a monorail, the presence of theme pavilions, and the incorporation of boats on a lake.  (*Id.*)  Section V explains similarities in building design such as the use of globes at the entrances and the fact that the globes are positioned inside courtyards.  (*Id.* at 4).  Section VI contains Colbert's conclusions on the similarity between the Epcot rendering and Miniature Worlds painting based on his analysis of similar ideas that the two works contain.  (*Id.* at 5).

Sections I-VI of the Colbert report are conclusory and based on underlying ideas rather the expression of those ideas.  Colbert's new affidavit merely urges the Court to reconsider its previous findings.  The Court has reevaluated the Colbert report and finds that Sections I-VI were properly excluded.

Plaintiff asks the Court to clarify whether the Court struck paragraph 12 of Colbert's affidavit. It should be clear from the Court's Order that the Court struck the entire affidavit on the grounds of timeliness.  The Amended Case Management Scheduling Order imposed a deadline of June 1, 2004 for

the disclosure of Plaintiff's expert reports.  (Doc. No. 68, filed on March 8, 2004).  Colbert's affidavit

was filed on October 5, 2004 and is untimely.  (Doc. No. 201).  Thus, paragraph 12 is inadmissible.

Plaintiff also contends that the Court erred in striking the expert reports of Robert Rydell,

Frank Costantino, and Peter Alexander, arguing that these experts used a proper methodology that did

not simply compare ideas.

The Court has reevaluated the expert reports of Rydell, Costantino, and Alexander.  Rydell's

analysis was clearly limited to comparing similar ideas in the Miniature Worlds painting and Epcot

rendering.  (Doc. No. 152, Ex. B, "Rydell Report," pp. 2-4).  Rydell's analysis notes how the Epcot

rendering and Miniature Worlds painting contain underlying elements like globes, amphitheaters,

railroads and boats, national representations, a United States pavilion, horticultural exhibits,

landscaping, a globalization theme, and lakes.  (*Id.*)  Rydell's conclusion that the Miniature Worlds

painting and Epcot rendering are similar is based on the fact that both works contain certain underlying

ideas.  Thus, the Court properly found that Rydell's expert report was inadmissible because Rydell

relied on impermissible comparisons of underlying ideas.

The Court previously found that the "findings of the study" section on pages 6 and 7 of

Alexander's report was inadmissible to prove substantial similarity.  That section lists random ideas

that the Epcot rendering and Miniature Worlds painting have in common and does not contain an

analysis of the expressive aspects of those elements.  (*See* Doc. No. 152, Ex. C, "Alexander Report,"

pp. 6-7).  Alexander explains that both projects immerse the guests into recreations of the lifestyle of

different countries by using theme architecture, and both works use a large-scale globe at the entrance

of the park.  (*Id.* at 6).  The fact that both the Epcot rendering and Miniature Worlds painting use

theme architecture and contain globes at the entrance of the park is illustrative of Alexander's

problematic, idea-based analysis.  Alexander's deposition testimony also reveals that his analysis was

fundamentally flawed:

> "Q: The entrances between Miniature Worlds on the painting and Epcot are different, aren't
> they?
> A: No, startling similar to me.  I mean, yeah, it's two different pieces of artwork but it looks
> like the same idea.
> Q: Same idea.
> A: Yeah, the same concept...."

(Doc. No. 164, "Peter Alexander Deposition," filed on September 1, 2004, pp. 145-46).  Because

Alexander conducted an analysis based on an improper methodology, the Court did not consider the

"findings of the study" section on pages 6 and 7.

In the alternative, Plaintiff argues that Alexander's expert report is admissible as a lay opinion

under Federal Rule of Evidence 701.  Rule 701 states that if a witness is not testifying as an expert

then the witness' testimony is limited to those opinions or inferences which are rationally based on the

perception of the witness, helpful to a clear understanding of the witness' testimony, and not based on

scientific, technical, or other specialized knowledge within the scope of Rule 702.  FED. R. EVID. 701.

First, Plaintiff's contention that Alexander is a lay witness is belied by Alexander's own report

in which he states: "The attached documents of my professional experience in the field of architectural

illustration accurately describes my capabilities and qualifications to serve in the requested capacity as

Expert Witness."  (Doc. No. 152, Ex. C, p. 1).  Second, Alexander's conclusion that the Miniature

Worlds painting and Epcot rendering are substantially similar is not the type of opinion contemplated

by Rule 701 as being rationally based on the witness' perception.  *See, e.g., U.S. v. Marshall*, 173 F.3d

1312, 1315 (11th Cir. 1999) (explaining that the opinion of a lay witness is admissible only if it is

based on first-hand knowledge or observation of such a witness' opinion that a person with whom he

had spoken was drunk or that a car he observed was traveling in excess of a certain speed).  Finally,

the third provision of Rule 701, which requires that the lay witness' opinion not be based on scientific, technical, or other specialized knowledge under Rule 702, requires that "a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702." *See* FED. R. EVID. 701 advisory committee's note.  In other words, Alexander must comply with Rule 702 in order to analyze whether the Epcot rendering and Miniature Worlds painting are substantially similar because a specialized background is necessary to reach such a conclusion, and Plaintiff cannot use Rule 701 as a loophole to overcome evidentiary deficiencies under Rule 702.  Thus, Rule 702 applies to Alexander's report, and the Court has already found that Alexander's report does not comply with Rule 702 because he used an improper methodology that was based on ideas rather than expression.  Therefore, the Court rejects Plaintiff's argument that Alexander's testimony is admissible under Rule 701.

Similar to the reports of Colbert, Rydell, and Alexander, Costantino's report is lacking in an analysis of expressive elements.  Costantino explains that the Epcot rendering and Miniature Worlds painting contain numerous similar design elements such as the use of a large-scale globe structure, the inclusion of a large body of water, a railway system, the depiction of large scale pavilions, distinct building groupings of varied international character, the inclusion of public, performance, or planted landscaped spaces, and the use of iconic structures of foreign countries.  (Doc. No. 152, Ex. D, "Costantino Report," p. 1).  While Costantino concludes that the Miniature Worlds painting and Epcot rendering are substantially similar, his analysis is faulty because he relies on lists of ideas.  Thus, the Court properly found that the Costantino report was inadmissible on the issue of substantial similarity.

Plaintiff contends that the Court may rely on the deposition testimony of the experts and that

this deposition testimony creates a genuine issue of material fact on the issue of substantial similarity. The depositions, however, ultimately affirm the fact that Plaintiff's experts utilized an improper methodology that impermissibly compared ideas.[3]  Plaintiff's argument that the deposition testimony is admissible is merely a thinly veiled attempt to admit evidence that the Court previously found was inadmissible under *Daubert*.  Such argument is not well taken.

### b.    Argument That Plaintiff's Expert Reports Were Timely Filed

The Court previously struck the affidavits of Frank Costantino, Thomas Colbert, Peter Alexander, Robert Rydell, and the supplemental report of Peter Alexander, finding that the filing of Costantino, Colbert, Alexander, and Rydell affidavits and the filing of the supplemental report of Peter Alexander violated Federal Rule of Civil Procedure 26.  Rule 26(a)(2)(C) states that expert reports "shall be made at the time and in the sequence directed by the court."  FED. R. CIV. P. 26(a)(2)(C). Rule 37(c)(1) provides that a party that without substantial justification fails to disclose information required by Rule 26(a) is not, unless such failure is harmless, permitted to use that evidence at trial, at a hearing, or on a motion.  FED. R. CIV. P. 37(c)(1).  The Amended Case Management Scheduling Order imposed a deadline of June 1, 2004 for the disclosure of Plaintiff's experts' reports.  (Doc. No. 68, filed on March 8, 2004).  The Court also imposed a deadline of October 15, 2004 for the disclosure

---

[3] Colbert's deposition is merely a reiteration of the findings that he reached in his expert report.  (*See* Doc. No. 162, "Thomas Colbert Deposition," filed on September 1, 2004, pp. 61-67).  In his deposition, Rydell explains the historical background to Epcot, including the impact of past Worlds Fairs.  (Doc. No. 163, "Robert Rydell Deposition," filed on September 1, 2004, p. 46).  Alexander testified that the Epcot rendering and Miniature Worlds painting were based on the same idea.  (Doc. No. 164, "Peter Alexander Deposition," p. 145).  Alexander's testimony is merely a reaffirmation of the conclusions contained in his expert report.  (*See id.* at 162-63). Costantino takes the opportunity to explain the findings of his expert report in his deposition. (Doc. No. 167, "Frank Costantino Deposition," filed on September 1, 2004, p. 61).

of Plaintiff's financial expert reports.  (Doc. No. 86, filed on May 26, 2004).   Failure to file a

supplemental expert report prior to the deadline imposed by the district court is a sufficient basis to

exclude the report.  *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003)

("the 'addendum' to Fisher's report on which the class focuses specifically in its brief was not timely

filed and this alone was a sufficient basis for the district court to reject its admission").

Because the affidavits of Costantino, Alexander, Rydell, and Colbert were filed on October 5,

2004, the Court found that these affidavits were untimely filed, thus violating the Amended Case

Management and Scheduling Order and Federal Rule of Civil Procedure 26(a).  (Doc. Nos. 200, 201).

The supplemental expert report of Peter Alexander, which analyzes the substantial similarity issue and

the financial impact of Epcot on Walt Disney World, was written on October 15, 2004 and was filed on

October 19, 2004.  (Doc. No. 220, Ex. 7).  The Court found that Plaintiff's untimely filings of these

expert affidavits was not harmless because Defendant was not able to probe the opinions contained in

the reports through additional deposition testimony.[4]

Plaintiff argues that the supplementation provisions of Rule 26(e)(1) require a party to

supplement the testimony of any expert from whom a report under Rule 26(a)(2)(B) has been

submitted.  Plaintiff contends that he had an obligation to amend expert testimony until 30 days before

trial.

Rule 26(e)(1) states that a party who has made a disclosure under Rule 26(a) has a duty to

supplement, at appropriate intervals, its disclosures, if the party learns that in some material respect the

information disclosed is incomplete or incorrect and if the additional information has not been made

known to the other parties during the discovery process.  FED. R. CIV. P. 26(e)(1).  The

---

[4] Discovery closed on August 2, 2004.  (Doc. No. 68).

supplementation provision in Rule 26(e)(1) does not supersede Rule 37(c)(1) which requires a party to demonstrate substantial justification if a disclosure is not made by the deadline.  *See, e.g., Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 20 (1st Cir. 2001) ("the duty of a party to seasonably supplement its disclosures under Rule 26(e) 'carries with it the implicit authority of the district court to exclude such materials when not *timely* produced even if there was no rigid deadline for production.'") (emphasis in original).  Plaintiff has failed to demonstrate that his failure to disclose the expert affidavits in a timely manner was substantially justified or harmless.  If accepted by the Court, Plaintiff's argument would turn Rule 26(e)(1) into a loophole allowing litigants to sandbag the opposition by filing incomplete expert witness opinions and then submitting entirely new expert opinions under the guise of supplementation.  *See, e.g., Macaulay v. Anas*, 321 F.3d 45, 50 (1st Cir. 2003) ("[s]ince an important object of these rules is to avoid trial by ambush, the district court typically sets temporal parameters for the production of such information").  Plaintiff's treatment of Rule 26(e)(1) would ultimately nullify the protections provided by Rule 37(c)(1).

If, as Plaintiff claims, the subsequent affidavits were not really supplemental but merely reiterated the claims contained in the earlier expert reports, then the reports would be both cumulative and inadmissible under *Daubert* because the experts utilized an improper methodology in rendering their opinions.

Plaintiff cites *Kennett Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980), in support of his argument that the affidavits are admissible.  *Bone* is not applicable to the instant case.  In *Bone*, the Fifth Circuit noted that the district court, in considering a motion for summary judgment, must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts with an earlier deposition.  *Id.*  The *Bone* case does not address whether Plaintiff may have considered

expert affidavits untimely filed in violation of the Amended Case Management and Scheduling Order and the Federal Rules of Civil Procedure.

Finally, Plaintiff contends that Rule 56(e) empowers the Court to accept the untimely filed affidavits. However, Rule 56(e), while allowing supporting and opposing affidavits to be filed, does not permit Plaintiff to untimely file expert affidavits in violation of the Amended Case Management and Scheduling Order and the Federal Rules of Civil Procedure. To hold otherwise would create the anomaly of allowing the expert reports to be considered on Motion for Summary Judgment but to exclude them and testimony based on the reports at trial due to their untimely filing.

### 2. Issues Regarding Substantial Similarity of the Epcot rendering and Miniature Worlds painting

#### a. Argument that the Dissection Test is Inapplicable to Works of Visual Art

Plaintiff argues that the dissection analysis is appropriate for mediums of expression involving literary works, computer technology, and factual compilations. When dealing with a complex work of visual art, however, Plaintiff argues that the Court must examine the totality of elements in order to determine whether two works of visual art are substantially similar. Plaintiff contends that the Court inappropriately applied a dissection test to the facts of this case. Plaintiff's argument, however, has the ultimate effect of urging the Court to forgo analytically separating the protectable expression from the unprotectable ideas in a work of art and to simply glance at two works of art, looking for substantial similarity by applying a "gut test." Plaintiff cites *Disney v. Air Pirates*, 345 F.Supp. 108, 114 (N.D. Ca. 1972), *aff'd in part, rev'd in part*, 581 F.2d 751 (9th Cir. 1978), *Kouf v. Disney*, 16 F.3d 1040, 1045 (9th Cir. 1994), and *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106 (9th Cir. 1970), in support of his argument. All are inapposite to the instant case.

In *Air Pirates*, the trial court in the Northern District of California did not discuss the analytical

test that courts should apply to visual works of art.  In that case, the trial court examined whether plaintiff's characters were protected by copyright law, whether the defense of fair use was available to the defendants, and whether the First Amendment guarantees of free speech and press protected the defendants' conduct.  345 F.Supp. at 110-116.

In *Kouf v. Walt Disney Pictures & Television*, the Ninth Circuit articulated the test to be applied when analyzing the similarities of expression between two works.  16 F.3d at 1045.  The Ninth Circuit explained the components of the extrinsic and intrinsic copyright tests.  *Id.*  The extrinsic test, which is an objective test based on specific expressive elements, focuses on concrete similarities between two works.  *Id.*  The intrinsic test analyzes whether the ordinary, reasonable person would recognize the defendant's work as a plagiarization of the plaintiff's work.  *Id.*  For the purposes of summary judgment, only the extrinsic test is important.  *Id.*  The Ninth Circuit applied the extrinsic test to a film and screenplay to conclude that no reasonable jury could find that the two works were substantially similar.  *Id.*  Contrary to Plaintiff's argument, *Kouf* does not stand for the proposition that analytical dissection of the protectable expression from the unprotectable ideas is inappropriate in cases analyzing substantial similarity between two visual works.

In *Roth Greeting Cards*, the Ninth Circuit analyzed whether defendant had copied the plaintiff's greetings cards.  429 F.2d at 1110.  The appellate court found that in total concept and feel, the cards of the defendant were the same as the cards of the plaintiff.  *Id.*  In reaching this conclusion, the Ninth Circuit found a number of similar factors, including the characters depicted in the art work, the mood the cards portrayed, the combination of art work conveying a particular mood with a particular message, and the arrangement of the words on the greeting cards.  *Id.*  The appellate court noted the remarkable similarity between the greeting cards was so striking that even a casual observer

would be struck by the similarity.  *Id.*

Plaintiff urges an overly broad reading of *Roth Greeting Cards*.  In that case, the Ninth Circuit examined the level of protectable expression in the paintings by analyzing the expressive elements. Unprotectable ideas have to be identified and filtered out before a work can be analyzed as a whole. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 825-26 (9th Cir. 2002) ("As with literary works, unprotectible elements should not be considered when applying the extrinsic test to art work.").   Thus, *Roth Greeting Cards* does not support Plaintiff's argument that an alternative test applies to works of visual art.  Filtering out the unprotectable ideas remains important.  Otherwise, courts would have to haphazardly engage in a "gut-test" to determine whether two works of art are substantially similar. The Court finds that Plaintiff's argument that an alternative test applies is not supported by the cases he cites.

> **b.        *Argument that the Court Misapplied the Virtual Identicality Standard***

Plaintiff argues that the Court misapplied the virtual identicality standard in determining whether the Epcot rendering and Miniature Worlds painting were substantially similar.  Plaintiff contends that the issue before the Court is whether elements or significant subparts of the work define original expression and if the significant subparts are, in a side-by-side comparison, substantially similar to those subparts of the accused work.

Plaintiff has misunderstood the analytical framework applied by the Court.  The Court did not determine whether the Epcot rendering and Miniature Worlds painting were strikingly similar based on a comparison of the works in a vacuum.  Rather, the Court determined that the Epcot rendering was not appropriated from the Miniature Worlds painting by filtering out the unprotectable ideas and comparing the works at the protectable level of expression.  Plaintiff's argument that the Court failed

to conduct the proper query is ultimately a disagreement with the result reached after the Court applied the proper analytical framework.

Plaintiff takes issue with the fact that the Court filtered out the unprotectable ideas when conducting the similarity analysis. Filtering out unprotectable ideas is critical in conducting the analysis, and Plaintiff's opining that such a filtering process is inappropriate is contrary to Eleventh Circuit case law. *See, e.g., Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994) ("[i]n addition to broad ideas, noncopyrightable material includes '*scenes a faire*'–stock scenes that naturally flow form a common theme."). While Plaintiff argues that the copyright defenses of merger and *scenes a faire* are not issues in this case because the Miniature Worlds painting is a subject which is "without precedent in human history," Plaintiff's argument is unsupportable by the furthest stretch of the most imaginative, creative reading of Eleventh Circuit case law.

Plaintiff's argument is also belied by the report of his own expert, Robert Rydell. (Doc. No. 152, Ex. B). In the unstricken parts of the report, Rydell compares ideas that the Epcot rendering and Miniature Worlds painting had in common with each other and with past World's Fairs. For example, Rydell explains that the Miniature Worlds painting had a globe and that World's Fairs since 1939 featured giant globes or globe-like structures. (*Id.* at 2). Rydell notes that such fairs generally relied on water-based exhibits, including fountains and lakes. (*Id.*) The 1893 Chicago Fair featured lagoons, islands, and condolas [sic]. (*Id.* at 2-3). Rydell concludes that the Miniature Worlds painting and the Epcot rendering include such images. (*Id.* at 3). Rydell also explains that the Miniature Worlds painting contains villages and pavilions similar to past World's Fairs. (*Id.*) According to Rydell's testimony, the Miniature Worlds painting is not without precedent in human history because Miniature Worlds was modeled after World's Fairs.

-16-

While Plaintiff claims that the Court failed to apply the appropriate analytical test, Plaintiff's own analysis is lacking because Plaintiff fails to compare the Miniature Worlds painting and Epcot rendering as a whole at the level of protectable expression.  In his motion for reconsideration, Plaintiff has submitted an elaborate chart analysis which amounts to minute, meticulous analytical dissection of the works.  This chart categorizes the ideas and expressions contained in the Epcot rendering and Miniature Worlds painting in a vacuum, lists random similarities, and does not examine whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."  *Original Appalachian Artworks*, 684 F.2d at 829.  The Court finds that the proper analytical framework was applied in its Summary Judgment Order in determining whether the Epcot rendering and Miniature Worlds painting were similar.

> ### *c.     Argument that the Court should receive Guidance from Architectural Cases*

Plaintiff argues that the Court erred in applying the substantial similarity analysis because analogous architectural cases hold that the expression of otherwise unprotectable elements can be protectable.  Plaintiff contends that plans or drawings that merely propose the use of conceptual elements are not protectable because such plans represent ideas.  If the plans evolve beyond vague notions relating to the placement of elements and express in detail the realization of ideas, Plaintiff argues that copyright law affords protection.  Plaintiff cites *Sparaco v. Lawler, Mutusky & Skelly Eng'rs LLP*, 303 F.3d 460, 467, 468 (2d Cir. 2002) (finding that the district court was justified in concluding that the defendants were entitled to summary judgment as to the site plans to the extent they identified existing factual information about the site and finding that the district court erred in concluding that the site plan's indication of new proposed elements fell into the category of unprotected ideas) , *Rottlund Co. v. Pinnacle Corp.*, 2004 U.S. Dist. LEXIS 16723, *79-*80 (D. Minn.

2004) (finding that no party is entitled to summary judgment on the issue of substantial similarity because a reasonable juror could find that the total look and feel of how the drawings selected, arranged, and coordinated the elements is substantially similar), *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1298-99 (D.C. Cir. 2002) (finding that the district court erred in conducting its substantial similarity analysis and noting that there were significant similarities in the "overall look and feel" of the two designs), *Fun Spot of Florida, Inc. v. Magical Midway of Central Florida, Ltd.*, 242 F.Supp. 2d 1183, 1198 (M.D. Fla. 2002) (report and recommendation of magistrate judge found that substantial similarity was a jury issue), and *Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F.Supp. 1560, 1567 (M.D. Fla. 1995) (finding that the defendant misappropriated the plaintiff's protected copyright), in support of his argument.  The Court has evaluated each of these cases and finds that they do not constitute an intervening change in controlling law sufficient to warrant a reconsideration of the Order granting summary judgment.

Plaintiff's argument also overlooks the fact that the Court explicitly stated in its Order that "copyright law can protect the overall arrangement of these unprotected elements in the Miniature Worlds painting."  (Doc. No. 229, p. 30).

Finally, Plaintiff's attempt to equate architectural cases to the instant case is not well taken. The record reflects that the nature of Plaintiff's copyright is for an oil painting, not architectural plans. (Doc. No. 198, Ex. 1, "Certificate of Copyright Registration").  Plaintiff's argument is that the copyright on his painting gives him the right to preclude the building of an international theme park which is the idea embodied in the Miniature Worlds painting.  However, copyright protection does not extend to ideas–only to the specific expressions of an idea.  17 U.S.C. § 102(b).  As applied to a painting, this means that while the subject matter of a work cannot be protected by copyright, the

-18-

artist's expression of an idea may be protected.  *See Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884) (stating that posing of subject, lighting, shading, and selection and arrangement of costume, draperies, and accessories are original aspects of a photograph); *see, e.g., Franklin Mint Corp. v. National Wildlife Art Exchange, Inc.*, 575 F.2d 62, 65 (3d Cir. 1978) (explaining the dissimilarities in expression of two paintings containing cardinals such as color, body attitude, position, and linear effect); *see, e.g., Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994) (protection may be claimed for the animal heads and tails themselves, and for the way they are placed on duffle bags, but not for the general idea of animal heads on duffle bags); *see also Gentieu v. John Muller & Co., Inc.*, 712 F.Supp. 740, 742 (W.D. Mo. 1989) (copyrightable expressive elements in a photograph include the photographer's selection of background, lights, shading, positioning, and timing).  Thus, a copyright on a painting does not give rise to a cause of action for the construction of the idea embodied in the painting.

Plaintiff's argument that the Miniature Worlds painting is analogous to an architectural plan is also contradicted by Plaintiff's earlier argument that the painting constitutes a visual work of art similar to the art work contained in the greeting cards in the *Roth Greeting Cards* case.

Because the Miniature Worlds painting is copyrighted as an oil painting and not as an architectural plan, Plaintiff's argument that this case is analogous to architectural cases is not well taken.

  **d.**  ***Argument that Admissible Evidence satisfies the Extrinsic Prong of the Substantial Similarity Test***

Plaintiff argues that he has provided admissible evidence to satisfy the extrinsic prong of the substantial similarity test.  Plaintiff cites to Costantino's deposition and affidavit, Alexander's deposition and affidavit, Rydell's affidavit, and the extensive chart analysis that Plaintiff submitted for

the first time with his motion for reconsideration.  The Court has already found that the deposition

testimony of these experts is inadmissible on the issue of substantial similarity because the depositions

ultimately demonstrate that the experts used an improper methodology and merely reiterated the

conclusions contained in the expert reports.  The experts' affidavits are also inadmissible because they

were not timely filed with the Court.  Finally, the chart analysis is inadmissible because it was not

submitted to the Court when analyzing Defendant's Motion for Summary Judgment.  The chart also

fails to assist the Court in determining whether an average lay observer would recognize the alleged

copy as having been appropriated from the copyrighted work because it contains random lists of

alleged similarities which are "'inherently subjective and unreliable.'"  *Herzog v. Castle Rock*

*Entertainment*, 193 F.3d 1241, 1257 (11th Cir. 1999).  Therefore, the Court finds that Plaintiff has not

satisfied the extrinsic prong of the substantial similarity test.

## Motion for Reconsideration

### Analysis

Plaintiff moves for reconsideration arguing seven separate grounds: 1) the deposition testimony

of lay witnesses, particularly, Marion Jaffray, Patricia Jaffray Jones, and Lynn Tucker; 2) the affidavit

of Douglas Keffer which Plaintiff contends is newly discovered, admissible evidence; 3) the Toledo

Blade article written by Michael Sallah; 4) other evidence gathered during discovery; 5) Defendant's

false denials; 6) Defendant's access to the Miniature Worlds painting as a disputed issue of fact; 7)

Robert Gorman's incompetency to render an expert opinion; and 8) the apparent lack of independent

creation.  The Court will address each of Plaintiff's arguments in turn.

### 1. Deposition Testimony of Lay Witnesses

In his brief, Plaintiff cites a hodgepodge of testimony from the depositions of Patricia Jones,

Marion Jaffray, and Lynn Tucker in support of his argument that Defendant had access to the Miniature Worlds painting.  Plaintiff cites additional portions of the deposition testimony of these witnesses in exhibits attached to his brief.  Plaintiff classifies this assortment of deposition testimony under self-made categories such as "Preparation for Jaffray's New York Presentation," "Waiting to hear from Disney," "Receipt of Rejection Letter," "Receipt of 1980 Press Clipping," and "Jaffray's Last Days."  Plaintiff argues that this creative collection of deposition citations demonstrates that Defendant had access to the Miniature Worlds painting.  The Court will analyze the admissibility of the deposition citations as they relate to each of these categories.

While Plaintiff cites several rules of evidence in support of his contention that the deposition testimony is admissible on the issue of access, the main infirmity with the testimony of these witnesses is that they lack personal knowledge.  *See* FED. R. EVID. 602.  Much of the testimony of these witnesses is based on conversations that they had with Robert Jaffray.  The witnesses never attended an alleged meeting between Jaffray and Disney officials and could not have personal knowledge about it.  Their testimony is based on what they contend Jaffray told them.  No basis for admission of these hearsay statements has been shown, and they will not be considered by the Court.

### a.      *Preparation for Jaffray's New York Presentation*

Plaintiff attempts to use Federal Rules of Evidence 406 and 701 to admit the testimony of Patricia Jaffray Jones, Marian Jaffray, and Lynn Tucker.  Rule 406 allows evidence of the habit of a person to prove that the conduct of the person was in conformance with the habit or routine practice.[5]

---

[5] Federal Rule of Evidence 406 states: "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." FED. R. EVID. 406.

FED. R. EVID. 406.  Rule 701 governs the admissibility of the opinion of testimony by lay witnesses.[6]

FED. R. EVID. 701.

When Marian Jaffray was asked whether she knew if Robert Jaffray had left a copy of his materials with Disney officials at the alleged meeting, Marian Jaffray testified that she had all the materials back and that tells her that the materials were returned.  (Doc. No. 173, "Marian Jaffray Deposition," filed on September 1, 2004, pp. 108-09).

Contrary to Plaintiff's argument, this testimony does not support an inference that Defendant had access to the Miniature Worlds painting, and any such inference is pure speculation.  First, Marian Jaffray does not have personal knowledge of an alleged meeting between Robert Jaffray and Disney officials.  Second, she testified that she did not know with certainty whether the Miniature Worlds painting was left with Disney officials.  (*Id.* at 108).  While Marian Jaffray testified that she has "every reason to think they [the materials] were" left with Disney officials, merely opining that she had every reason to believe the materials were left with Disney officials is not the kind of testimony that creates a genuine issue of material fact.

Plaintiff cites a lengthy portion of Jones' deposition in support of his argument that Defendant had access to the Miniature Worlds Painting.  Jones testified that she did not literally open Robert Jaffray's briefcase.  (Doc. No. 165, "Patricia Jaffray Jones Deposition, filed on September 1, 2004, p. 110).  She testified that she helped Jaffray with his presentations and helped him do the slide shows, so

---

[6] Federal Rule of Evidence 701 states: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701.

she knew what he always carried with him to do those types of presentations.  (*Id.*)  Jones also testified

that she did not actually see Jaffray put the photograph or slide of the Miniature Worlds painting into

his briefcase the day that he left for his trip.  (*Id.* at 110-11).  Jones stated that she does not remember

seeing the documents that Jaffray put in his briefcase because he was probably in his bedroom

assembling the materials.  (*Id.* at 111-12).

Plaintiff contends that because Jones assisted Jaffray in assembling presentations in the past

and knew that Jaffray included the Miniature Worlds painting among his materials, Jones' testimony is

admissible habit evidence under Rule 406 which gives rise to an inference that Jaffray brought the

painting with him to meet Disney officials and that Defendant had access to the Miniature Worlds

painting.

Habit or pattern of conduct is not to be lightly established, and evidence introduced for the

purpose of establishing such habit should be carefully scrutinized before admission.  *Loughan v.*

*Firestone Tire & Rubber Co.*, 749 F.2d 1519, 1524 (11th Cir. 1985) (internal citation omitted).  Such

an attitude towards habit evidence is necessary based on "'the collateral nature of [such proof], the

danger that it may afford a basis for improper inferences, the likelihood that it may cause confusion or

operate to unfairly prejudice the party against whom it is directed.'"  *Id.*  (internal citation omitted).

Only when examples offered to establish a pattern of conduct or habit are numerous enough to create

an inference of systematic conduct are those examples admissible.  *Id.*  (internal citations omitted).

The key criteria are "'adequacy of sampling and uniformity of response or ratio of reactions to

situations.'"  *Id.*  (citing Advisory Notes, Rule 406, Fed. R. Evid.).  Evidence is inadmissible under

Rule 406 unless there is an examination of the ratio of reactions to situations.  *Wilson v. Volkswagen of*

*America, Inc.*, 561 F.2d 494, 512 (4th Cir. 1977).  Regularity of conduct requires some comparison of

the number of instances in which any such conduct occurs with the number in which no such conduct

took place.  *Id.*

Jones' testimony is insufficient to establish that Jaffray regularly brought the Miniature Worlds

painting with him on business trips because she testified in broad generalities and failed to provide

specific, concrete, and sufficiently numerous examples of a course of conduct.

Furthermore, the practice of bringing the Miniature Worlds painting on a business trip is not

the type of "habit" contemplated by Rule 406.  Habit describes a person's regular response to a

repeated situation.  *Loughan*, 749 F.2d at 1524.  A habit is the person's regular practice of meeting a

particular kind of situation with a specific type of conduct, "such as the habit of going down a

particular stairway two stairs at a time, or giving the hand signal for a left turn, or of alighting from

railway cars while they are moving."  *Id.*  Jaffray's contemplative reflections as to whether or not to

bring the Miniature Worlds painting with him to a business meeting is not the type of reflexive or

semi-automatic act that typically constitutes habit evidence.  *See id.*

Even if the Court assumes that Jaffray brought the Miniature Worlds painting with him on his

business trip, Jones did not attend the alleged meeting between Jaffray and Disney officials.  Jaffray

could have brought his Miniature Worlds painting to a business meeting with anyone, not necessarily

Disney officials.  Jones has no first hand knowledge of a meeting between Jaffray and Disney officials,

and her testimony stating that such a meeting took place is inadmissible hearsay.

Plaintiff also contends that Lynn Tucker's testimony is admissible under Rule 701.  Plaintiff

cites Tucker as testifying that she believed that a meeting took place between Jaffray and Disney

officials.  (Doc. No. 249, Ex .A, p. 4).  Tucker, however, did not attend an alleged meeting that took

place between Jaffray and Disney officials, and her knowledge of the meeting, if based on

conversations with Robert Jaffray, constitutes inadmissible hearsay. *See* FED. R. EVID. 602. The Court finds that these selective citations of deposition testimony do not create a triable issue of fact on the issue of access.

### b.  *Waiting to Hear from Disney (1963)*

Plaintiff cites lengthy portions from the deposition testimony of Marian Jaffray and Patricia Jaffray Jones in support of his argument that Defendant had access to the Miniature Worlds painting and that a meeting took place between Jaffray and Disney officials. When asked whether she knew if Jaffray left materials with Disney officials, Marian Jaffray responded: "If he was presenting the–making the presentation at all, he would have obviously had them with him, with him to make the presentation. And maybe it was worked out that he would leave them until they made their decision–until they had their decision." (Doc. No. 173, "Marian Jaffray Deposition," pp. 174-75). Plaintiff contends that Marian Jaffray's testimony is admissible under Federal Rule of Evidence 701.

There are two problems with Marian Jaffray's testimony. First, Marian Jaffray merely assumes that Robert Jaffray brought the Miniature Worlds painting with him on his trip. Because she never assisted Robert Jaffray in packing for his trip, she lacks personal knowledge of what Jaffray actually brought with him on his trip. Second, Marian Jaffray did not attend an alleged meeting between Jaffray and Disney officials, and her testimony cannot be used to prove that such a meeting took place.

Plaintiff characterizes Patricia Jaffray Jones' testimony regarding what Jaffray did with the Miniature Worlds painting as the declarant's own prior testimony. Jones testified that she remembers when the family picked her father up from Union Station and vividly recalls her father walking towards her. (Doc. No. 165, "Patricia Jones Deposition," p. 124). Jones testified that she said to her father after he returned from the alleged meeting with Disney officials: "Dad, I can't believe you

-25-

would leave all of the plans, all the everything, with Disney." (*Id.*)

While Plaintiff characterizes this statement as the prior statement of a witness, Jones never helped Jaffray pack for his business trip and never attended an alleged meeting that took place between Jaffray and Disney officials.  Jones' initial statement is not based on her own personal knowledge because the only way that Jones could have information that Jaffray allegedly left the materials with Disney officials is if Jaffray told her.  Thus, the initial statement that Jones made years ago is inadmissible hearsay.  The fact that Jones reiterated during her deposition a hearsay statement made years earlier does not make the earlier-made hearsay statement admissible.  Jones' vivid recollections of events that allegedly occurred decades ago and which are based on statements made to her by another person are not the type of testimony that creates a genuine issue of fact.

Jones also testified that all the materials that Jaffray brought with him on his trip were eventually returned to the home.  Jones stated: "This is probably why I used the word reported because I didn't literally–I wasn't sitting there at the front door when it walked through the door.  All I know is I came home from school and everything was back." (*Id.* at 137).  Jones testified: "I know what he took up there...It's the same thing that he used everywhere...I don't know the method that they used to return everything.  I just know all of a sudden it was back in our house." (*Id.* at 137, 138).

Plaintiff contends that this testimony is admissible under Federal Rules of Evidence 602 and 406, arguing Jones could not have known what "everything" comprised had it not been the habit of Jaffray which she had many occasions to observe.

Plaintiff attempts to use Rule 406 to create an improper inference.  Jones testified in broad generalities and did not offer specific examples of Jaffray's packing habits for business trips.  Also, as the Court has previously noted, packing a painting for a trip, which requires calculated deliberation, is

not the type of reflexive action contemplated as habit evidence under Rule 406.  Finally, even if Jones'

testimony demonstrated that Jaffray brought the Miniature Worlds painting with him on a trip, Jones

lacks personal knowledge of where Jaffray went with the painting as well as to whom it was shown.

Thus, the deposition testimony of Marian Jaffray and Patricia Jaffray Jones does not create a genuine

issue of material fact on the issue of access.

  *c.*  ***Receipt of Rejection Letter***

  Plaintiff argues that Defendant had access to the Miniature Worlds painting based on Jones'

deposition testimony regarding the alleged 1963 rejection letter and her 1964 observation of her

father's depressed state.  Plaintiff argues that Jones' testimony that she viewed the alleged rejection

letter is admissible evidence under Federal Rule of Evidence 1004(1).

  Jones testified that approximately three or four weeks after her father allegedly met with Walt

Disney, her father received a rejection letter.  (Doc. No. 165, "Patricia Jones Deposition," pp. 115-16).

Jones testified that she remembers seeing the letter but does not recall who wrote the letter.  (*Id.* at

116).  When asked what the letter said, Jones stated "It was just a couple of sentences.  Thank you for

coming, showing us your materials.  Thank you, but we're not interested."  (*Id.*)  Jones testified that

the letter had the black and white Mickey Mouse logo on the top of it, and she had not seen the letter

since 1994.  (*Id.*)  Jones stated that when she moved back to Virginia she had a box of materials,

including the letter, and she gave the letter to Dr. Doug Keffer.  (*Id.* at 117).  Dr. Keffer informed

Jones that he had a client who was an international business entrepreneur, and he could possibly assist

her with the case.  (*Id.*)  Jones then gave the materials to Dr. Keffer, and when she went through the

box again, the letter was not there.  (*Id.* at 118).  Jones also testified "that's just speculation on my part

because I have no idea and believe me I wouldn't be sitting here saying there was a letter that I don't

have if I hadn't actually seen it." (*Id.*) Jones also stated that "the only possibility of where the letter might have gone is just speculation." (*Id.* at 117).

Plaintiff contends that Jones' testimony is admissible under Federal Rule of Evidence 1004(1) because Rule 1004 requires only that the proponent demonstrate that the original is unavailable.

Federal Rule of Evidence 1002 provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided...in these rules or by an act of Congress." FED. R. EVID. 1002.  Rule 1004(1), also known as the best evidence rule, states that the "original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible if–all originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad faith." FED. R. EVID. 1004(1).  The purpose of the best evidence rule is to prevent inaccuracy and fraud when attempting to prove the contents of a writing. *U.S. v. Ross*, 33 F.3d 1507, 1513 (11th Cir. 1994) (citing FED. R. EVID. 1001 advisory committee's note).  Plaintiff attempts to use the best evidence rule to overcome the fact that the alleged 1963 rejection letter from Walt Disney to Jaffray is nowhere to be found.  According to Plaintiff, Jones' testimony establishes the existence of that letter and demonstrates that Defendant possessed the Miniature Worlds painting.

Plaintiff is relieved of the burden of producing the original and can produce secondary evidence if Plaintiff can prove that the writing existed and has been lost or destroyed.  *Klein v. Frank*, 534 F.2d 1104, 1107-08 (5th Cir. 1976) ("if the party relying upon the writing can prove that a writing existed and has been lost or destroyed, he is relieved of the burden of producing the original and can present secondary evidence of its contents"); *see also Sellmayer Packaging Co. v. Commissioner of Internal Revenue*, 146 F.2d 707, 710 (4th Cir. 1944) (one who offers secondary evidence of contents of

a document allegedly lost must demonstrate to the court's satisfaction that the document once existed, that after a diligent search it cannot be found, and that there is no reasonable probability that it has been designedly withheld or suppressed).  Thus, the Court must determine whether Plaintiff has properly demonstrated that the original was lost or destroyed and that such loss or destruction was not in bad faith.  Proof of loss or destruction is often established by circumstantial evidence unless a party testifies that he personally destroyed or witnessed the destruction of the document.  *U.S. v. McGaughey*, 977 F.2d 1067, 1071 (7th Cir. 1992).  While Rule 1004 does not contain an independent requirement that a search be conducted, the performance of a diligent search is an avenue by which the larger issue of the document's destruction may be proved.  *McGaughey*, 977 F.2d at 1071.

As to the loss of the original, Plaintiff has proffered the testimony of Jones that she viewed the letter and speculated that the letter was lost when she handed over a box of documents to Dr. Keffer. Jones' testimony does not demonstrate a diligent effort in trying to search for the alleged lost letter. Rather, her testimony merely demonstrates that she believed that the alleged letter was in a box of documents and that she is now unable to locate the alleged letter.  Merely speculating that the letter was probably among a box of documents and is now lost is not the type of diligent search and inquiry necessary to meet the requirements of the best evidence rule.[7]  *See, e.g., United States v. England*, 480 F.2d 1266, 1268 (5th Cir. 1973) (finding that district court had appropriately excluded testimony concerning the contents of a letter when the proponent failed to account for loss of the copy of the

---

[7] The Court's best evidence analysis also applies to Plaintiff's citation of Marian Jaffray's deposition testimony.  Marian Jaffray testified that she remembered seeing the rejection letter and that it stated that "they were not interested."  (Doc. No. 173, "Marian Jaffray Deposition, p. 107).  Jaffray stated: "I don't know how they worded it.  I think that's all I can say on that."  (*Id.*) Marian Jaffray also testified as to the whereabouts of the letter: "I don't know.  I think she [Patricia Jaffray] had it. I don't know if she has it now."  (*Id.*)

letter from his files, other than to testify that the files survived two years, two kids, two dogs, and a house full of rats); *see also Cartier v. Jackson*, 59 F.3d 1046, 1048 (10th Cir. 1995) (finding that the district court had appropriately excluded evidence under Rule 1004 when the proponent's search for the lost piece of evidence entailed telephoning friends and colleagues and where proponent failed to compel record companies to respond to her requests).

Assuming *arguendo* that the Court found that Jones' testimony was admissible, this testimony would not demonstrate evidence of access by Defendant.  First, Jones does not even know who wrote the alleged letter.  (Doc. No. 165, "Patricia Jaffray Jones Deposition," p. 116).  The alleged letter could have been written by anyone, and Jones' testimony does not support the contention that the alleged letter was authored by Walt Disney.  Second, the alleged letter writer merely thanked Jaffray for showing him or her his materials and does not refer to the Miniature Worlds painting.  Thus, Jones' testimony does not support the inference that the alleged letter writer had access to the Miniature Worlds Painting.  Because Jones' testimony is inadmissible under the best evidence rule, and even if admissible it does not demonstrate that Disney officials viewed the Miniature Worlds painting, the Court finds that Jones' testimony does not demonstrate evidence of access.

Plaintiff also cites Jones'1964 observation of her father's depression as evidence of access.  Jones testified: "[I]t was in '63 that he went to Disney because in '64 was when the whole idea–he was all depressed about it and because he started a pet store, that's why he started a pet store.  He started a whole another business because once the not-interested came from Disney that was the big backer he was hoping would kick in and then he couldn't get enough capital and he decided to start a chain of pet stores."  (Doc. No. 165, "Patricia Jaffray Jones Deposition," p. 114).  Plaintiff argues that Jones' understanding of why Jaffray was depressed is admissible direct observation evidence under Federal

Rule of Evidence 602 and an admissible lay opinion under Rule 701.[8]

While Jones testified that the alleged rejection letter led to her father's depression, implicit in Jones' testimony is the fact that she could not have known what was depressing her father unless he had told her.  The reason why Jaffray was depressed, the receipt of the alleged rejection letter, is based on inadmissible hearsay.  Thus, it is clear that these citations of deposition testimony do not create a genuine issue of material fact on the issue of access.

### d.      Receipt of 1980 Press Clipping

Plaintiff argues that the Court should reevaluate the admissibility of a statement made by Jaffray on the grounds that the statement constitutes an excited utterance.  Years after Jaffray allegedly received a rejection letter from Walt Disney, Jones was with her father in 1980 when he reviewed a newspaper article containing a picture of the final Epcot design.  (Doc. No. 165, "Patricia Jaffray Jones Deposition," p. 140).  When Jaffray actually viewed the design, Jones testified that he stated "'Oh my God, they built it' and then he showed it to us and then he said 'I left everything with them.'  He said 'They must have copied everything; blueprints.'  He had left–he said exactly what he left at that time.  He said he left blueprints, he left the site map, he left all the drawings and he said, 'They must have photographed and copied everything.  No wonder they kept it for a month.'"  (*Id.*)

In his motion for reconsideration, Plaintiff merely reiterates arguments raised in his summary judgment brief regarding the admissibility of this statement under the excited utterance exception to

---

[8] Federal Rule of Evidence 602 states: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.  Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.  This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses."  FED. R. EVID. 602.

the hearsay rule.  In the Order analyzing Defendant's motion for summary judgment, the Court found

that the statement constituted inadmissible hearsay.

There are several problems with Jones' testimony regarding Jaffray's statement.  First, the

excited utterance exception is available only if the declarant had first hand knowledge of the subject

matter of the statement.  *See, e.g., Bemis v. Edwards*, 45 F.3d 1369, 1373 (9th Cir. 1995).  When there

is no evidence of perception, apart from the declaration, courts have hesitated to allow the excited

utterance to stand alone as evidence of the declarant's opportunity to participate or observe the event.

*Miller v. Keating*, 754 F.2d 507, 511 (3d Cir. 1985).  Because there is no evidence that a meeting even

occurred between Disney officials and Jaffray, Plaintiff failed to demonstrate that Jaffray had first-

hand knowledge of the facts asserted in the statement.

Second,  Jaffray's statement is insufficient to establish the occurrence of a meeting between

Jaffray and Disney officials as well as Defendant's access to the Miniature Worlds painting.

Circumstantial evidence of Jaffray's participation in an alleged meeting is so scanty as to forfeit the

guarantees of trustworthiness which form the hallmark of all exceptions to the hearsay rule.  *See, e.g.,*

*Miller,* 754 F.2d at 511; *see also U.S. v. Brown*, 254 F.3d 454, 460 (3d Cir. 2001) ("the question

whether corroborating evidence independent of the declaration is needed in a given case to establish

the occurrence of such an event is committed to the discretion of the trial judge.").

Furthermore, receiving a newspaper article with a picture of the Epcot design is not a startling

occasion, and Plaintiff failed to cite any case law to support such a proposition.  *See U.S. v. McLennan*,

563 F.2d 943, 948 (9th Cir. 1977) ("'[m]ost courts...would probably be extremely skeptical regarding

whether one merely informed of an event could become so excited upon hearing of it as to lose the

power of reflective thought'") (Doc. No. 197, p.7 n.8).

Finally, even assuming that reading a newspaper is an exciting event, under the excited utterance exception the utterance must relate to the circumstances of the exciting event preceding it and must be closely related in time to the exciting event.  *See, e.g., U.S. v. Alarcon-Simi*, 300 F.3d 1172, 1175-76 (9th Cir. 2002) (district court appropriately excluded the defendant's statement because the statement did not relate to the incident that occurred *at the time of his arrest* and instead related to earlier events) (emphasis in original).  Here Plaintiff argues that the exciting event is the receipt of the newspaper article in 1980.  Jaffray's statement may be related to the receipt of the article, but his statement cannot be admissible as an "excited utterance" referring to a meeting that allegedly occurred in 1963, seventeen years earlier.

Because Plaintiff has failed to demonstrate that the Court's reasoning on this point was clearly erroneous or manifestly unjust, the Court rejects Plaintiff's argument that Jaffray's statement is admissible under the excited utterance exception.

### e.      *Jaffray's Last Days*

Plaintiff contends that Lynn Tucker's deposition testimony is admissible under Rule 701. Tucker testified: "But I think it just all came to a head that, wow, somebody else took his dream and went with it.  And then he was dying and he was never going to be able to realize any contentment or anything and we just want to do that for him."  (Doc. No. 160, "Lynn Tucker Deposition," filed on September 1, 2004, p. 109).  Tucker's statement implies that Defendant stole Plaintiff's idea.  Tucker's testimony is based on speculation.  Tucker lacks any first hand knowledge of the alleged meeting between Disney officials and Jaffray, and the Court will not consider Tucker's statement on the issue of access.

The Court's analysis of the numerous deposition citations in Plaintiff's brief and the exhibits

attached to Plaintiff's brief illustrates that Plaintiff has relied on hearsay testimony and testimony that is not based on personal knowledge.  Therefore, the Court finds that the deposition citations do not demonstrate that Defendant had access to the Miniature Worlds painting.

### 2. Keffer Affidavit

Plaintiff argues that the affidavit of Dr. Douglas Keffer comprises newly discovered evidence under Federal Rule of Civil Procedure 60(b).  Plaintiff contends that the affidavit sets forth evidence never before known and which, in the exercise of diligence, could not have been discovered.

Keffer testified that in 1994 or 1995 Patricia Jaffray worked in his practice in Roanoke, Virginia as an associate.  (Doc. No. 249, Ex. F, "Douglas Keffer Affidavit," ¶ 1).  Keffer stated that Jaffray brought to him a box of her father's papers, documents, and belongings regarding Miniature Worlds, and one of the documents that he reviewed was a letter from Disney to Robert Jaffray.  (*Id.* at ¶¶ 4,6).  Keffer testified that he does not specifically remember the date of the letter, the author of the letter, or even the specific text of the letter, but he does recall that it was a rejection letter to Robert Jaffray for his Miniature Worlds project.  (*Id.* at ¶ 7).  Keffer stated that the letter used the term "Miniature Worlds."  (*Id.* at ¶ 8).  Keffer also testified that he was provided with a copy of the June 1963 letter from Reddy to Jaffray and was asked to determine if it was the same letter that he saw and reviewed when he went through the contents of the box.  (*Id.* at ¶ 10).  Keffer concluded that the letter from Reddy to Jaffray was not the same letter that he saw and reviewed when he went through the contents of the box.  (*Id.* at ¶ 12).  This testimony merely adds to the speculative questions as to how many letters, from whom, and containing what contents there may have been.

As previously noted, the Eleventh Circuit has described a motion for reconsideration as falling within the ambit of either Rule 59(e) (motion to alter or amend a judgment) or Rule 60(b) (motion for

relief form judgment).  *Region 8 Forest Serv. Timber Purchases Council v. Alcock*, 993 F.2d 800, 806 n.5 (11th Cir. 1993).  Under Rule 60(b), a successful motion for reconsideration based on newly discovered evidence must satisfy a five-pronged test: "(1) the evidence must have been newly discovered since the judgment was entered; (2) due diligence on the part of the movant to discover the new evidence has been exercised; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that is likely to produce a new outcome if the case were retried, or is such that would require the judgment to be amended."  *Taylor v. Texgas Corp.*, 831 F.2d 255, 259 (11th Cir. 1987).  Similarly, if a party relies on newly discovered evidence in its Rule 59(e) motion, the party must produce a legitimate justification for not presenting the evidence during the earlier proceeding.  *Pacific Ins. Co. v. American Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) (internal citation and quotations omitted).  The Court "will not permit Plaintiff to prevail on a motion for reconsideration when summary judgment for Defendant was granted due to lack of diligence on the part of Plaintiff."  *Prieto v. Storer Communications, Inc.*, 152 F.R.D. 654, 655 (M.D. Fla. 1994).

Plaintiff contends that he had no reason to believe that there was more than one rejection letter from Walt Disney.  Not realizing that there was more than one rejection letter, there was no reason to re-interview Keffer on this issue.  With the emergence of the June 1963 rejection letter, Plaintiff states that he diligently attempted to reach Dr. Keffer, but it was only in the last ten days that a paralegal was able to reach him.

Plaintiff's argument that he exercised due diligence in procuring the Keffer affidavit is without merit.  It is clear that Plaintiff knew of the potential of Keffer's testimony since June 2003 when Plaintiff's initial disclosures under Federal Rule of Civil Procedure 26 identified Keffer.  (Doc. No.

276, Ex. B, "Rule 26 Disclosures," filed on January 27, 2005, p.3).   In addition, Patricia Jaffray Jones

affirmed the potential of Keffer's testimony when she testified that she gave the box of documents

containing the rejection letter to Keffer.  (Doc. No. 165, "Patricia Jaffray Jones Deposition," p. 117).

While Plaintiff characterizes his failure to re-interview Keffer on the rejection letter issue as a simple

lack of imagination, Plaintiff's lack of diligence is the actual cause of the failure to procure this

evidence before the entry of judgment.  The record reflects that Defendant provided Plaintiff's counsel

with a box containing the 1963 letter from Reddy to Jaffray.  (Doc. No. 276, Ex. C, "Affidavit of

Gianluca Greco," ¶ 5).  The letter was scanned and Bates stamped on March 23, 2004, copied onto a

computer disc on April 7, 2004, and delivered to Plaintiff's counsel.  (*Id.*)  Thus, Plaintiff was aware of

the June 1963 letter in March 2004, and Plaintiff failed to re-interview Keffer.  The fact that Plaintiff

did not conduct a thorough, careful investigation prior to the entry of judgment prevents Plaintiff from

taking a "second bite at the apple" now by offering Keffer's affidavit as newly discovered evidence.

*See, e.g., Plisco v. Union R. Co.*, 379 F.2d 15, 16 (3d. Cir. 1967) ("newly discovered evidence within

the meaning of Rule 60(b)(2) is evidence 'of which the aggrieved party was excusably ignorant' at the

time of trial.'").  Because Plaintiff has not introduced specific facts establishing his diligent attempts to

procure this "newly discovered evidence," the Court finds that the Keffer affidavit is not admissible.

Even if Keffer's affidavit could be considered newly discovered evidence, it would not be

admissible under Federal Rule of Evidence 1004 because the Court has already found that Plaintiff

failed to establish that the original letter was lost or destroyed and that such loss or destruction was not

in bad faith.  While Jones speculated that Keffer lost the alleged letter, Keffer does not state what he

did with the letter or whether he lost the letter.  Thus, the Court finds that the Keffer affidavit fails to

create a genuine issue of material fact on the issue of access.

### 3. Admissibility of Sallah Affidavit

Michael Sallah testified by affidavit that in 2000, during his investigation of a story, Jaffray told him that he met with Disney representatives in the early nineteen sixties in New York and showed them a slide show presentation that included the aerial view of the Miniature Worlds painting.  (Doc. No. 249, Ex. G, "Sallah Affidavit," ¶2).  Sallah stated that he asked the Disney company to allow him to search its archives for any information regarding Jaffray or his proposal.  (*Id.*)  Disney Archivist Dave Smith refused Sallah's request.  (*Id.* at ¶ 3).  Sallah continued his investigation and wrote an article titled "Disney's Design: Was Epcot an Ohio Man's Vision" which appeared in the May 2000 edition of the Toledo Blade.  (*Id.* at ¶ 4).  The article is based on interviews with Jaffray and other family members and details an alleged meeting that took place between Jaffray and Disney officials. (Doc. No. 249, Ex. G, "Toledo Blade Article").  Attached to the Sallah affidavit is the letter from Dave Smith and the Toledo Blade article.  In the letter, Smith writes that he had checked Walt Disney's files and there was no correspondence in Walt Disney's files with Mr. Jaffray.  (Doc. No. 249, Ex. G, "Dave Smith Letter").

Plaintiff asserts that the Toledo Blade article and Dave Smith letter constitute evidence of access by Walt Disney to Jaffray's files.  Plaintiff argues that the Toledo Blade Article is admissible as an admission against interest.  Federal Rule of Evidence 804(b)(3) defines an admission against interest as a statement "which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."  FED. R. EVID. 804(b)(3).

The Toledo Blade article is not admissible as an admission against interest because the article

was written by a person about statements made to him by Jaffray and Jaffray's friends and relatives.

Nothing in the article purports to be an admission against interest by Defendant.  The article

constitutes inadmissible hearsay and is clearly an attempt by Plaintiff to have the Court consider

deposition testimony that the Court already determined must be excluded.

By contending that the Dave Smith letter demonstrates evidence of access by Defendant to the

Miniature Worlds painting, Plaintiff attempts to equate the failure of Defendant to provide a newspaper

reporter access to its business files as an admission against interest on the grounds that refusal to

provide access is a failure to contest an assertion.  The United States Supreme Court has clearly stated

that "failure to contest an assertion, however, is considered evidence of acquiescence only if it would

have been natural under the circumstances to object to the assertion in question." *United States v.*

*Hale*, 422 U.S. 171, 176 (1975).  The Court's independent research has not produced any case in

which failure to provide a newspaper reporter access to private business files constitutes an admission

against interest in a subsequent civil case between the business and another person.  It is not unusual

for a private business to refuse to let outsiders have access to its private business files.  Therefore, the

Court rejects Plaintiff's argument that the Dave Smith letter and newspaper article should be

considered as an admission against interest.

Plaintiff next contends that the article is admissible under the residual exception to the hearsay

rule, given the eminent professional position of Sallah as a Pulitzer Prize Winner and the long,

distinguished military career of Jaffray.

Federal Rule of Evidence 807 describes the residual exception to the hearsay rule.  If a

statement has circumstantial guarantees of trustworthiness equivalent to statements under Rules 803

and 804 and if the Court determines that the statement is offered as evidence of a material fact, is more

probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and the general purpose of the rules and the interests of justice are served by admission of the statement, then such a statement is admissible under the residual exception.[9] Fed. R. Evid. 807.

Plaintiff's argument that the article is admissible under the residual exception to the hearsay rule is without merit because Plaintiff has failed to demonstrate that the article has the necessary circumstantial guarantees of trustworthiness. If the declarant's "truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." *Idaho v. Wright*, 497 U.S. 805, 820 (1990). The Sallah article contains the same hearsay problems that the Court has identified throughout this Order. Thus, the truthfulness of the statements contained in the article is not so clear that cross-examination would be of marginal utility. The facts that Sallah is an eminent writer and that Jaffray had a distinguished military career do not demonstrate the requisite level of trustworthiness under Rule 807.[10] Because the Sallah article is based on hearsay and Plaintiff has failed to demonstrate that the

---

[9] Rule 807 states: "A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence." Fed. R. Evid. 807.

[10] In *U.S. v. Wilkus*, 875 F.2d 649, 655 (7th Cir. 1989), the Seventh Circuit explained that the district court appropriately found that an affidavit was not admissible under the catchall exception to the hearsay rule, reasoning that the affidavit was unreliable in view of the affiant's mental and physical state at the time it was executed. Given this inherent unreliability, the Seventh Circuit found that the interests of justice would not be served by the admission of the affidavit. *Id.* There is no showing in the record of the physical and mental state of Mr. Jaffray to make accurate statements at the time that Sallah wrote the Toledo Blade article.

article has circumstantial guarantees of trustworthiness, the interests of justice would not be served by admitting this article into evidence.  Therefore, the Court finds that the Toledo Blade article is inadmissible under Rule 807 and that the Sallah affidavit has no evidentiary significance.

### 4. Other Evidence Gathered During Discovery

In the next portion of Plaintiff's brief, Plaintiff characterizes correspondence, pictures, and affidavits gathered during discovery as concrete evidence of Defendant's access to the Miniature Worlds painting.  Plaintiff argues that Defendant's failure to explain the meaning of certain words contained in correspondence and that Defendant's failure to explain inconsistencies demonstrates that Defendant copied the Miniature Worlds painting.  The Court has evaluated the exhibits, pictures, letters, affidavits, and other items cited by Plaintiff and finds that the record is lacking on the issues of access and copying.  On a motion for summary judgment, an absence of evidence in the record on an essential element demonstrates that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").  While Plaintiff attempts to paint a picture of access and copying by Defendant, Plaintiff's arguments amount to speculation and conjecture.

Plaintiff categorizes this panoply of exhibits into several categories which are "Disney and the 1964 Worlds Fair," "Sklar Doodles in 1971," "Graphic History 1969-74," "Chaos Ensues," and "Hench and the Epiphany of 1978."  The Court will analyze the arguments contained in each of these subcategories.

### a.      Disney and the 1964 Worlds Fair

Plaintiff draws the Court's attention to a May 27, 1963 letter from Joseph Reddy, publicity

director of the Disney company, to Jim Cotrell, a Disney official, in which Reddy writes: "Is there anything we can do with this?" (Doc. No. 198, Ex. 5, "Note from Reddy to Cottrell"). Plaintiff argues that Defendant has failed to offer any explanation of the word "this" in the communication.

On a motion for summary judgment, the moving party, in this case Defendant, bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Because Defendant has met this burden, Plaintiff must show, by going beyond the pleadings, that there exists a genuine issue of material fact. *Hairston v. Gainesville Sun. Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). The burden is on Plaintiff to demonstrate that Jaffray met with Disney officials and brought the Miniature Worlds painting with him to a meeting. Thus, Defendant does not bear the burden to explain the term "this" in the letter.

Plaintiff also cites a portion of the June 6, 1963 letter from Reddy to Jaffray:

"The delay in replying to your kind letter of May 10th was due to the fact that it had been in the hands of men associated with Walt on the Ford and General Electric project for next year's World's Fair. I just received their comment on it this morning. They inform me that we are only designing the exhibits..." (Doc. No. 198, Ex. 6, "Reddy Letter to Jaffray," filed on October 5, 2004).[11]

Plaintiff argues that Defendant cannot tell Plaintiff or the Court what Jaffray submitted to Defendant during this period of correspondence in 1963 and cannot refute the fact that the Miniature Worlds painting was in the hands of men associated with Walt Disney.

Plaintiff's argument demonstrates a fundamental misunderstanding of the burden of proof on summary judgment. Because Defendant demonstrated the absence of a genuine issue of material fact on the issue of access, the burden is on Plaintiff to demonstrate that the Miniature Worlds painting was

---

[11] Only the letter was in the hands of men associated with Walt Disney. Reddy does not state that the Miniature Worlds painting was in the hands of men associated with Walt Disney. Such an inference is unsupported by the letter.

placed in the hands of persons associated with Walt Disney.  Plaintiff asserts that Defendant bears the

burden of demonstrating that Disney officials did not meet with Jaffray, that Jaffray did not bring the

Miniature Worlds painting with him to a meeting with Disney officials, and that Jaffray did not mail

the Miniature Worlds painting to Disney officials in his correspondence with Defendant.  (*See* Doc.

No. 249, p. 15).  However, Defendant only bears the burden of showing an absence of a genuine issue

of material fact.  Defendant has shown that there is no evidence in the record demonstrating that a

meeting took place between Jaffray and Disney officials or that Defendant had access to the Miniature

Worlds painting.  An absence of fact from the record is different from negating the non-occurrence of

an event.  If accepted by the Court, Plaintiff's argument would place the burden on Defendant of

factually refuting an event as to which Defendant has demonstrated a lack of evidence from the record.

This is not the law as enunciated by the Supreme Court in *Celotex v. Catrett*, 477 U.S. 317, 323

(1986).

Next, Plaintiff cites to a series of mechanical drawings and sketches.  MKS Affidavit Exhibit

14 is a mechanical drawing depicting proposed floor plans for an International Gardens exhibit at the

Ford Pavilion's of the World's Fair.  MKS Affidavit Exhibit 15 contains architectural sketches by John

Hench and Donald Edgren of miniature structures for the International Gardens Exhibit.  Two separate

scales are depicted on the drawing.  One scale states 2"=1' and an additional scale states that ½"=1'.

MKS Affidavit Exhibit 16.1.b contains a concept sketch for International Gardens with a handwritten

notation "model at 1"=1'.0."[12]

Plaintiff argues that an explanation of the remarkable coincidence of scale and timing has never

---

[12] Peter Alexander testified that the Miniature Worlds painting depicted a scale that was
one inch to one foot.  (Doc. No. 164, "Deposition of Peter Alexander," p. 145).

been offered by Defendant.  Plaintiff contends, without any evidentiary support in the record, that prior to June 1963 the idea of using miniatures in the International Gardens area of the Ford Exhibit had not existed.  Plaintiff asserts that the miniature idea abruptly appeared at the time of Jaffray's June 1963 correspondence with Disney executives.

Plaintiff's contention that the use of a miniature scale in the International Gardens Exhibit is evidence of Defendant's access to the Miniature Worlds painting is demonstrative of the pattern of speculative and frivolous arguments that Plaintiff has raised throughout his motion for reconsideration. In making this argument, Plaintiff implies that the use of a miniature scale or miniature exhibit proves that Defendant had access to the Miniature Worlds painting.  The use of a miniature scale by Defendant on the Ford's Fair does not mean that Defendant appropriated the use of the miniature theme from the Miniature Worlds painting.  Plaintiff has not proffered any evidence demonstrating that the use of a miniature theme in the Miniature Worlds painting was so unique and extraordinary that the use of a miniature theme by Defendant in work unrelated to Epcot could have been derived only by access to the Miniature Worlds painting.

Plaintiff contends that MKS Affidavit Exhibit 25, a letter dated January 24, 1964 from Martin Sklar to Jerry Sullivan of the Ford Motor Company, demonstrates Defendant's access to the Miniature Worlds painting.  In the letter, Sklar wrote that the Pepsi-Cola show is called Walt Disney's "It's a Small World."  In the letter, Sklar stated that the Disney company wanted to avoid confusion with the Pepsi Cola show.  In order to avoid confusion, Sklar stated that everyone working with the Disney company did not want Walt Disney's name used in connection with the title of the Ford show.  While Sullivan suggested a title such as "Walt Disney's World in Miniature" for the Ford show, Sklar felt that such a title would be a direct conflict with the Pepsi-Cola show and most confusing to the public.

Sklar suggested titles such as "Ford's International Lands in Miniature" or "Ford's Lands in Miniature."  There is no statement as to where these two shows were being presented.

Plaintiff argues that Sklar's desire not to associate the Disney name with the term "Miniature" or "World" is circumstantial evidence of access.  Evidence of access is not demonstrated by such flimsy and speculative assertions.  The fact that the Disney company did not want a title such as "Walt Disney's World in Miniature" to be used in connection with the Pepsi-Cola show does not mean that Defendant had access to the Miniature Worlds painting.  Rather, it illustrates that the Disney company did not want Walt Disney's name associated with those terms to avoid confusion with the Pepsi-Cola show.

### b.    *Sklar Doodles in 1971*

Plaintiff contends that a handwritten note by Martin Sklar, leader of the Epcot team, demonstrates that Defendant had access to the Miniature Worlds painting.  The note reads "Miniature World, Micro Miniature Worlds, Cat------>Route to the Future."  (Doc. No. 198, Ex. 7, "Sklar Handwritten Note").  When asked about the note, Sklar testified that he "was falling asleep in a meeting" at the time that he doodled the comments.  (Doc. No. 198, Ex. 14, p. 176).  Sklar does not remember what he was thinking at the time that he created the note.  (*Id.*)

As the Court previously found in its Order analyzing Defendant's motion for summary judgment, Sklar's handwritten noted merely demonstrates that Sklar wrote the term "Miniature World" on a piece of paper during a meeting.  It does not demonstrate that Sklar or Defendant had access to the Miniature Worlds painting.  Any such finding would be pure speculation and conjecture and unsupported by the record.

### c.    *Graphic History 1969-1974*

Plaintiff draws the Court's attention to a series of drawings and letters.  Plaintiff cites to MKS

Affidavit Exhibit 5, MKS Affidavit Exhibit 27, MKS Affidavit Exhibit 28, MKS Affidavit Exhibit 29,

and MKS Affidavit Exhibit 30.  MKS Affidavit Exhibit 5 is the Miniature Worlds painting.  MKS

Affidavit Exhibit 27 contains concept renderings by Mr. Ryman.  (*See* Affidavit of Melvin K.

Silverman, "Description of MKS 27").  MKS Affidavit Exhibit 28 is a memorandum by Marty Sklar

titled "International Street."  Reference is made to an international waterfront along a lagoon with

additional waterfront canals on site.  MKS Affidavit Exhibit 29 is a letter from Vince Jefferds in which

he discusses expanding the International Street concept.  MKS Affidavit Exhibit 30 is the 1974-75

design concept which contains two semi-circular buildings facing each other between a courtyard.

The Court has evaluated the letters and pictures cited by Plaintiff.  This assorted collection of

letters, exhibits, and pictures does not create a genuine issue of material fact on any issue before the

Court.  The selection of these exhibits by Plaintiff is random and merely confirms that Plaintiff has

failed to meet his burden in creating a genuine issue of material fact in this case.

### d.      Chaos Ensues

Plaintiff characterizes the Epcot design process at the Disney company as chaotic in an attempt

to overcome evidentiary deficiencies on the issue of access.  Plaintiff cites the testimony of Peter

Alexander, Walter Myall, and Martin Sklar in support of his argument.  Peter Alexander, who worked

for the Disney company, testified that Epcot was a "large project" and "there was no organized process

of culling out what all the options were of what the company could do and then selecting something

we should do...there was no formal capital approval process."  (Doc. No. 164, "Peter Alexander

Deposition," p. 28).

Walter Myall also worked for the Disney company and was involved in the Epcot project.

(Doc. No. 166, "Walter Myall Deposition," p. 35).  Myall testified: "Walt sure screwed us up when he died.  He left us without.  Then it got worse from Him to Eisner and that's when I left."  (*Id.* at 37).  Myall also stated:

> "When General Motors had signed up they got all excited about it and they sent 15 of their vice presidents down to Florida for the ground-breaking of their pavilion and I was in Florida at the time and I got wind of them coming.  I went to Dick Irvine and said, the way things are right now I don't know where their pavilion is.  Dick said, just take them out in the jungle with a shovel and a photographer and say that's it.  And that's what I did."  (*Id.* at 67).

Martin Sklar, another Disney company employee, testified that in late 1976 some of the ideas in the design of Epcot had substantial differences from each other.  (Doc. No. 198, "Excerpts from the Deposition of Martin Sklar," p. 122).

Plaintiff has selectively quoted the testimony of Alexander, Myall, and Sklar in order to paint a picture of a chaotic situation at the Disney company.  Plaintiff, however, has failed to demonstrate how the testimony of Alexander, Myall, and Sklar creates a genuine issue of material fact on any issue before the Court.  First, Alexander's testimony relates to the capital approval process, not the Epcot design process.  Plaintiff has mischaracterized the record in choosing to selectively cite snippets of Alexander's deposition testimony.  Second, the fact that Myall had no idea where the pavilion in Epcot was to be located does not create a triable issue of fact.  Finally, Sklar's testimony merely demonstrates that the creative process at the Disney company resulted in different ideas that developed over time.  Plaintiff's argument that these selective citations of deposition testimony demonstrate access to the Miniature Worlds painting and copying by Defendant is pure speculation.

### e.   *Hench and the Epiphany of 1978 & Disney's Failure to Explain Similarities*

Plaintiff argues that the record reflects that the Epcot rendering simply arose out of thin air because Epcot did not arise out of a creative evolutionary process and Defendant cannot point to any

earlier graphic form for the Epcot rendering.

Plaintiff's contention is without merit.  Defendant has produced the affidavit of Martin Sklar who was one of two creative executives responsible for overseeing the design, planning, and construction of Epcot.  (Doc. No. 158, Attachment #5, "Affidavit of Martin Sklar," filed on September 1, 2004, ¶ 4).  Sklar testified that Epcot was the result of a "long and painstaking creative process at Disney, which started in the 1950s."  (*Id.* at ¶ 6).  Walt Disney created the idea of Epcot, and the early evidence of Disney's vision could be seen in original renderings.  (*Id.* at ¶ 7).  Two exhibits attached to Sklar's affidavit clearly depicted the international area in color in one of the Epcot segments.  (*Id.*)  Sklar explained how Epcot arose of the International Street concept, which was to feature buildings representative of different countries.  (*Id.* at ¶ 8).  Sklar also explained how the design of Epcot evolved over time.  (*Id.* at ¶ 16).  Some changes were aesthetic while others were driven by investment and cost concerns.  (*Id.*)  During the creative process, many different ideas are considered, though some ideas were never turned into finished theme park attractions.  (*Id.* at ¶ 21).  Thus, the record reflects that the Epcot rendering did not arise out of thin air, as Plaintiff argues.  Rather, the Sklar affidavit emphasizes that Epcot was the result of painstaking and deliberate creative reflection by Defendant's creative team.

Plaintiff also argues that Defendant has no plausible explanation for the selection and arrangement of key elements in Epcot which Plaintiff asserts are similar to the selection and arrangement of key elements in the Miniature Worlds painting.  However, Sklar testified that the selection and arrangement of key elements within Epcot was the product of the creative process at the Disney company and not the result of access to the Miniature Worlds painting.  Furthermore, the Court has already found that the Epcot rendering and Miniature Worlds painting are substantially different at

the protectable level of expression, and Plaintiff has not cited any evidence or case law for the Court to find otherwise.

The Court finds that Plaintiff has failed to show that the other evidence he gathered during discovery creates a triable issue of fact on any issue before the Court.

### 5. Argument that Disney's False Denials Constitute Evidence of Access

Plaintiff argues that a defendant's denial of access can be overcome if there is evidence that the defendant was lying. Plaintiff cites *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 113 (5th Cir. 1978), in support of his argument. In *Ferguson*, the Fifth Circuit noted that to find access it would have to assume that the defendant's employee was lying when he said he had never heard of the plaintiff's composition. *Id.* The appellate court found that the plaintiff had not given the court any reason to believe that this assumption was true. *Id.* To support a finding of access, there must be a reasonable possibility of access, not a bare possibility. *Id.*

Plaintiff has not proffered any evidence upon which a reasonable jury could base an inference that Defendant was not truthful on the issue of access. Therefore, the Court finds that Plaintiff's contention that Defendant's false denials constitute evidence of access is without merit.

### 6. Argument that Whether Disney Had Access to the Miniature Worlds Painting is a Disputed Issue of Fact Requiring Trial

Plaintiff argues that the difficultly in pinpointing a specific document among millions is not fatal to his claim of access, especially where Plaintiff has unearthed documentary evidence and the credibility of Defendant is very much in doubt.[13]

Because Defendant has demonstrated that there is no genuine issue of material fact, Plaintiff

---

[13] Plaintiff has not cited any evidence demonstrating that Defendant's credibility is in doubt.

bears the burden to establish the existence of a dispute.  *Hairston v. Gainesville Sun. Pub. Co.*, 9 F.3d

913, 918 (11th Cir. 1993).  Thus, Plaintiff's admitted inability to locate any evidence is fatal to his

claim.  While Plaintiff has produced volumes of evidence, the quantity of evidence produced is not

helpful because it does not create a genuine issue of material fact.

### *7. Argument that the Report of Gorman is Incompetent and Should Be Stricken*

Plaintiff argues that the expert report of Robert Gorman should be stricken because the report is

clearly incompetent as the opinion of an architect.  In support of his argument, Plaintiff has attached

the affidavit of Thomas Colbert, an architect and urban planner and professor of architecture at the

University of Houston.  (Doc. No. 249, "Colbert Affidavit," Ex. J, filed on December 8, 2004, ¶ 1).  In

the affidavit, Colbert testifies that Gorman's opinions are reflective of a "seriously incomplete and

misleading understanding of the artistic works under consideration."  (*Id.* at ¶ 32).  Colbert contends

that Gorman's understanding is superficial because he does not acknowledge the importance of the

overall design of the site and its program and basic conception.  (*Id.*)  Colbert states that Gorman

offered an architectural opinion even though Gorman lacks training in architectural history, design,

programming, and theory.  (*Id.* at ¶ 33).  Finally, Colbert asserts that Gorman's report is flawed

because it picks out individual features for separate discussion, thereby disregarding the fundamental

significance of an overall site arrangement and of the expressive use of elements within an overall

composition.  (*Id.* at ¶ 37).

Federal Rule of Evidence 702 provides that an expert can be qualified by knowledge, skill,

experience, training, or education.  FED. R. EVID. 702.  Gorman is a copyright law professor with

decades of experience in the field and is clearly qualified, based on his knowledge and experience, to

render an expert opinion on copyright law.  The Court finds that Gorman is qualified to testify as an

expert because expertise in architecture is not a prerequisite for Gorman to render conclusions dealing with copyright law.

The remainder of Colbert's testimony attacks the merits of the Gorman report rather than the qualifications of Gorman to testify as an expert.  While Colbert urges the Court to reconsider its ruling, the Court properly found that the Gorman report was admissible because Gorman used a proper methodology.  Colbert's affidavit is merely an attempt by Plaintiff to disagree with the Court's reasoning.

In the alternative, Plaintiff contends that if the Gorman report is admitted, Alexander's report should be admitted on the same basis since he, like Gorman, is not an architect.  In its Order analyzing Defendant's motion to strike the reports of Plaintiff's expert witnesses on the basis of *Daubert*, the Court struck Alexander's report because Alexander listed a series of ideas that the Miniature Worlds painting and Epcot rendering had in common and failed to delve into the expressive aspects of those ideas.  The Court did not strike the Alexander report due to Alexander's lack of an architectural background.  Thus, Plaintiff's argument is without merit.

### 8. Argument that Lack of Independent Creation is Apparent

While Plaintiff argues that uncanny similarities between the Epcot rendering and the Miniature Worlds painting demonstrate lack of independent creation, the Court has already found that there was uncontroverted evidence of independent creation based on the affidavit of Martin Sklar.  Plaintiff has not cited any new evidence or case law which would compel the Court to change this finding.

Plaintiff contends that because the Court struck the reports of Costantino, Rydell, Colbert, and Alexander only on the issue of substantial similarity and did not strike the reports on the issue of independent creation, there is a genuine issue of material fact on the question of whether Defendant

independently created Epcot.[14]

The Court has reevaluated the parts of the expert reports that were not stricken by Court Order. The Court struck Sections I-VI of the Colbert report. Section VII describes Water's creative contribution to Miniature Worlds, Section VIII explains why Waters is the author of the Miniature Worlds painting, Section IX concludes that the arrangement of elements in the Miniature Worlds painting is original, and Section X summarizes Colbert's conclusions. (Doc. No. 152, Ex. A, "Colbert Report," pp. 5-7). Sections VII-X of the Colbert report do not address the independent creation issue.

Rydell's report provides extensive historical analysis on World's Fairs. (Doc. No. 152, Ex. B, "Rydell Report," pp. 2-8). Rydell also discusses the connection between World's Fairs and Epcot. (*Id.*) The only inference that arises from the Rydell report is that Walt Disney may not have created the ideas underlying Epcot because he may have used past World's Fairs as a basis for Epcot. Copyright law, however, protects only expression, not the ideas underlying that expression. The unstricken portions of the Rydell report do not address the independent creation issue.

The Court found that the "findings of the study" section on pages 6 and 7 of Peter Alexander's report was inadmissible on the issue of substantial similarity. In the other parts of the report, Alexander explained how Epcot is a unique theme park when compared to other types of parks and that the Epcot design was not the result of an evolution of ideas based on Alexander's analysis of documents produced during discovery. (Doc. No. 152, Ex. C, "Alexander Report," pp. 3,4). Alexander describes the Epcot design process as fractured, disjointed and lacking in intermediate steps. (*Id.* at 4, 5). Even assuming a lack of a seamless evolution of ideas in the design of Epcot, such a statement does not give rise to an inference that Defendant did not independently create Epcot. The

---

[14] Plaintiff raises this identical argument in his motion for clarification.

Alexander statement merely illustrates that Defendant considered different ideas for Epcot.  The fact that different ideas were considered for the Epcot design is reflective of the creative design process at Defendant which was the result of long and painstaking deliberations that began in the 1950s  (Doc. No. 158, Attachment #5, "Sklar Affidavit," ¶ 6).  Alexander's report does not create a genuine issue of fact on the question of independent creation because it is based on speculation and does not point to any evidence demonstrating that Defendant did not independently create Epcot.

Finally, the Costantino report addresses the substantial similarity issue and does not address whether Defendant independently created Epcot.  (Doc. No. 152, Ex. D, "Costantino Report," p. 1).

Thus, the unstricken parts of the Colbert, Alexander, Rydell, and Costantino reports do not create a triable issue of fact on the question of whether Defendant independently created Epcot.

### Failure to Meet the Motion for Reconsideration Standard

Plaintiff has not pointed to new evidence or case law that create a triable issue of fact on any matter before the Court.  Because there is no clear error or manifest injustice, Plaintiff's motions for clarification and reconsideration are **denied**.

### Conclusion

Based on the foregoing, the Court **DENIES** Plaintiff's Motion for Clarification (Doc. No. 250) and Motion for Reconsideration (Doc. No. 248).

**DONE** and **ORDERED** in Chambers in

Orlando, Florida on April _28th___, 2005.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record